UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO
ALBUQUERQUE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: 1:15-MJ-03673-LF |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Albuquerque, New Mexico |
| | ) | |
| DAVON LYMON, | ) | Tuesday, October 27, 2015 |
| | ) | (10:20 a.m. to 10:50 a.m.) |
| Defendant. | ) | |

PRELIMINARY / DETENTION HEARING

BEFORE THE HONORABLE KIRTAN KHALSA,
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:               JACOB WISHARD, ESQ.
                             Office of the U.S. Attorney
                             District of New Mexico
                             P.O. Box 607
                             Albuquerque, NM 87103

For Defendant:              MARC H. ROBERT,ESQ.
                             Office of the Federal Public Defender
                             First State Bank Building
                             111 Lomas Boulevard NW, Suite 501
                             Albuquerque, NM 87102

U.S. Probation/Pretrial: A. Candelaria

Court Reporter:             Recorded; Liberty - Gila

Clerk:                      E. Hernandez

Transcribed by:             Exceptional Reporting Services, Inc.
                             P.O. Box 18668
                             Corpus Christi, TX 78480-8668
                             361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>INDEX</u>

| <u>GOVERNMENT'S WITNESS</u> | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> |
|---|---|---|---|---|
| DEREK WRIGHT | | 4 | 17 | |

<u>RULING RE PROBABLE CAUSE</u>    19


<u>ARGUMENT RE DETENTION</u>

BY MR. ROBERT            19/22

BY MR. WISHARD           21


<u>RULING RE DETENTION</u>        23

 1    <u>Albuquerque, New Mexico; Tuesday, October 27, 2015; 10:20 a.m.</u>

 2                              <u>Call to Order</u>

 3           **THE CLERK:**  The *United States of America versus Davon*

 4    *Lymon.*

 5           **MR. WISHARD:**  Jake Wishard for the United States.

 6           **MR. ROBERT:**  Good morning, your Honor, Marc Robert

 7    for Mr. Lymon who is present in custody.  We are prepared to

 8    proceed with the Preliminary hearing.

 9           **THE COURT:**  Okay, good morning.  Good morning,

10    Mr. Lymon.

11           **THE DEFENDANT:**  Good morning, your Honor.

12           **THE COURT:**  All right.  I guess we will proceed at

13    this time.  Are you ready to proceed?

14           **MR. WISHARD:**  Yes, your Honor.  My witness is here.

15    I -- if the Court will allow us I'd like you just to adopt his

16    Probable Cause Statement in the Criminal Complaint and then

17    pass the witness to Mr. Robert.  If the Court wishes me to walk

18    him through the Complaint on a Direct exam I'm happy to do that

19    as well.

20           **THE COURT:**  Mr. Robert?

21           **MR. ROBERT:**  Either way is fine with me, your Honor.

22           **THE COURT:**  Okay.  Well, if there is no objection to

23    the Court allowing the Government to proffer the Probable Cause

24    statement that's attached to the Complaint and you proceeding

25    directly to Cross Examination, I'm prepared to adopt that.

1          **MR. ROBERT:**  No objection to that procedure, your

2    Honor.

3          **THE COURT:**  Okay.

4          **MR. WISHARD:**  The United States calls Task Force

5    Officer Derek Wright.

6          **THE CLERK:**  Please raise your right hand.

7           **DEREK WRIGHT, GOVERNMENT'S WITNESS, SWORN**

8          **THE WITNESS:**  Yes, ma'am.

9          **THE CLERK:**  Can you please have a seat, state your

10   name and spell your last name for the record?

11         **THE WITNESS:**  My name is Derek Wright, the spelling

12   of the last name W-R-I-G-H-T.

13                         **CROSS EXAMINATION**

14   **BY MR. ROBERT:**

15   Q    Tell us what you do for a living?

16   A    I am a police officer with the Albuquerque Police

17   Department.  I have been working there since January of 2006.

18   I have been assigned to the ATF Task Force for a little over

19   three years now.

20   Q    All right.  And since we -- we're going to do this by way

21   of a proffer, basically your Direct Examination will have been

22   the Probable Cause Statement that's been filed in the Court

23   already.

24         You are the person who signed and swore to this

25   Affidavit?

1   A     Yes, sir.

2   Q     Would you tell me a little bit about how you became

3   involved in this case?

4   A     The evening of October 21st I was notified by phone that

5   there was an officer that had been shot in the southeast area

6   of Albuquerque.  I responded to that area, as well as numerous

7   other officers.  I was near Eubank and Lomas for an extended

8   period of time.

9        The local SWAT teams were all conducting their

10  searches and we were all there just in case they needed us for

11  -- to check other locations or what had happened, and shortly

12  after, I guess it was midnight, I was made aware that an arrest

13  had been made and I responded to the area of Central and Eubank

14  where I was advised the subject that was in custody was

15  Mr. Lymon.

16       I conducted a Criminal History query, found out he

17  does have two felony convictions.  The firearm was recovered in

18  a block -- about a block and a half north of where the shooting

19  had occurred, and we queried and that firearm was found to not

20  have been manufactured in New Mexico affecting interstate

21  commerce.  He is a convicted felon.

22       When Mr. Lymon was taken into custody he was still

23  wearing a handcuff on his left wrist which, after viewing the

24  lapel camera video, Mr. -- the subject that had been arrested

25  by Officer Webster before being shot was handcuffed on his left

1  wrist, and I then completed a Criminal Complaint against him.

2  Q    All right.  You were not involved in the processes by

3  which Mr. Lymon was taken into custody?

4         In other words, you weren't part of the teams that

5  were trying to locate him and place him in custody?

6  A    Correct, I was not.

7  Q    Were you a part of any of the effort to locate the

8  firearm?

9  A    I was not, no.

10 Q    All right.  Have you been a part of any of the examination

11 or any testing that was done with respect to the firearm?

12 A    No, sir.

13       **THE COURT:**  I'm sorry, can I -- I need you-all to

14 keep your voices down.  Could you please move over to that end

15 of the pew and keep your voices down.  Thank you.  All right,

16 go ahead, I apologize.

17       **MR. ROBERT:**  No problem, your Honor.  Thank you.

18 **BY MR. ROBERT:**

19 Q    You mentioned a lapel cam.  This would have been Officer

20 Webster's lapel camera?

21 A    Yes, sir.

22 Q    Were there any other recordings that you are aware of that

23 were made relevant to the events of that evening?

24 A    There were numerous recordings made by officers either

25 responding, there was the helicopter video from their infrared

1  camera.  The helicopter, while traveling around, did observe a

2  male subject jumping over fences and into the area.  The SWAT

3  teams came in and located the subject they had seen, which was

4  Mr. Lymon.

5  Q    All right, do you know if there was -- what vehicle was

6  Officer Webster driving?  Was it a car or motorcycle?

7  A    Officer Webster?

8  Q    Yes.

9  A    He was in a marked patrol car.

10 Q    Okay.  Was there a dash cam in that car?

11 A    I don't believe there's dash cam in there, sir.  I haven't

12 heard anything about that.

13 Q    All right.  You said that the firearm was located about a

14 block and a half away from where the shooting occurred?

15 A    Well, just -- just north of Central and -- Eubank and

16 Central in the Walgreens, 10300 Central.

17 Q    Okay.

18 A    Just north of that is a street called "Glorieta" runs

19 north-south, and it was located in the 100 block of Glorieta in

20 a vacant lot.

21 Q    In a vacant lot.  Are there any structures on that lot at

22 all?

23 A    I -- I was not there to collect it; I was advised it was a

24 vacant lot.

25 Q    Okay.

1  A     There are some -- there's a gas station on the east side

2  of Glorieta at Central.  There are some houses as you go

3  farther north.  There's sporadic lots that are available.

4  Q    All right.  Okay.  I'd like to ask a little bit about the

5  timing of things.

6           When did the call come in that there had been an

7  incident?

8  A     Shortly before 8:00 o'clock.

9  Q    Okay.  When did you arrive on the scene?

10 A     It must have been 9:00 -- 9:00 o'clock, 9:30.

11 Q    Okay.  Do you know when -- you talked about aerial

12 surveillance.  When did that begin, do you know?

13 A    I do not know when the helicopter arrived or was called

14 out yet, I'm still gathering information from the police

15 department as to all of their dispatches and things like that.

16 Q    Was it minutes or hours, do you know?

17 A    It probably was not hours.  I'm sure they were notified

18 within minutes that they needed to get in the air and help

19 assist searching for the subject.

20 Q    I am assuming that there are recordings from the

21 helicopter that would probably include time notations, is that

22 right?

23 A     Yes, sir.

24 Q    Okay.  But you're not aware of the time at which those

25 things took place?

1    A    No, I do not know.

2    Q    All right.  How long after the incident was Mr. Lymon

3    taken into custody?

4    A    Probably had been four hours.  I think he was finally

5    taken into custody between 11:30 and 12:30, so threne and a

6    half, four and a half hours, somewhere in there, sir.

7    Q    What was the location in which that occurred?

8    A    120 Espejo northeast, which is about a block over to the

9    west, excuse me, from where the firearm was recovered.

10   Q    All right.  I want to talk a little bit about the firearm.

11   One of the things that's included in the Statement of Probable

12   Cause is that the gun was not test fired --

13   A    Right.

14   Q    -- because ballistics were still pending?

15   A    Correct.

16   Q    Were there any other tests that were performed on the

17   firearm obviously pending the ballistics study?

18   A    Right.  No, there was no other tests performed.  Some of

19   the ammunition that was recovered at the scene was three rounds

20   of Winchester and three rounds of Perfecta.  Those rounds of

21   ammunition had been expended, they had been fired.

22        When the firearm was recovered they found a round of

23   Perfecta ammunition in the chamber which is the same ammunition

24   that was recovered at the scene.

25        Perfecta is not a real common round of ammunition,

1   it's fairly new so we don't run into it a lot.

2   Q    All right.  But, obviously, we don't have results from

3   ballistics?

4   A    Correct.

5   Q    So the only thing we know is that it's the same brand that

6   you -- of which you found three shells at the site of the

7   shooting and there was one of the same brand in the firearm --

8   in the magazine?

9   A    Correct.

10  Q    How many rounds were in the firearm including the

11  magazine?

12  A    I did not manipulate it.  We were letting -- or no one

13  manipulated it on the scene, we let the criminalistics folks

14  from A.P.D. take care of that part.

15  Q    Have you been keeping in touch with the progress of the

16  investigation?

17  A    I have and they are still just going through all of their

18  items.  I have made numerous requests, I'm just waiting for the

19  information to come.

20  Q    All right, so you have received no information --

21  A    Correct.

22  Q    -- about any of those things with respect to the firearm?

23  A    Correct, I have not.

24  Q    Okay.  Do you know if the firearm was tested for

25  fingerprints?

 1  A    I do not know.

 2  Q    Okay.  That would be something, I'm sure, you're going to

 3  continue to follow up on?

 4  A    Yes.

 5  Q    All right.  Do you know if any tests were performed on

 6  Mr. Lymon?

 7  A    Yes.  I obtained a search warrant for Mr. Lymon's DNA and

 8  it was served when he was released from the hospital on

 9  Saturday at the Albuquerque Police Station at the main.  They

10  -- a field investigator arrived.  I was there and I showed him

11  his warrant.  They obtained the buccal swab samples and they

12  were transferred to the Criminal Crime Lab for analysis.

13  Q    All right.  How about gunshot residue?  Was that tested?

14  A    I don't believe so.  I have not heard if they did.

15  Q    Okay.  Is that something that's still done at all by

16  A.P.D. or ATF?

17  A    I have not heard of it being done.

18  Q    Okay.  You mentioned that there was a lapel camera

19  recording from the officer's lapel cam.

20       Was there anything -- have you viewed that recording?

21  A    Yes, sir.

22  Q    Is there anything on that recording that shows the face or

23  any other identifying characteristics of the person that was

24  involved in that incident?

25  A    Only that the left hand was handcuffed.  There is -- the

1    subject is wearing a helmet, Mr. Lymon, and there's a female in

2    the back seat and she had fled.  The lapel camera states -- the

3    officer is saying "There's the male subject running north" when

4    they arrived, meaning north -- they were north of Central into

5    the neighborhood where the firearm was recovered and Mr. Lymon

6    was arrested, but you could not see a face or anything like

7    that.

8    Q    Okay.  How much of the -- of that subject is visible on

9    the lapel cam?

10   A    Of?

11   Q    Of the person who was involved in the incident?

12   A    Oh, probably from midriff up.

13   Q    Do you know how long after the call went out from Officer

14   Webster until other officers arrived on the scene?

15   A    Probably two minutes I would estimate.

16   Q    And your testimony is that some of those officers observed

17   a subject running away from the scene of the incident?

18   A    Correct, I could see them and hear them on the lapel

19   camera pointing north as Officer Webster was laying on the

20   ground.  His lapel camera is looking up and there is an officer

21   on his radio calling out "The subject is running north" and

22   then they're making radio dispatch transmissions.

23   Q    All right.  I'd like to ask a little bit about the

24   handcuff.

25        You indicated that, of course, as you just said, the

1  lapel cam indicated that there was a handcuff on the subject at

2  the scene of the shooting.

3  A    Correct.

4  Q    And that there was a handcuff that was found on Mr. Lymon

5  when he was arrested.

6          Is there any way of identifying a pair of handcuffs

7  within the great number of handcuffs that's available to

8  A.P.D.?

9  A    There -- the Peerless handcuffs, apparently they found

10  Peerless handcuffs, I was advised, and they have serial

11  numbers.  The serial numbers from the manufacturer are sent to

12  various, you know, outlets where you can buy them.  This

13  specific set that was located -- or found to have been

14  transferred to Neve's, it's like a police store you can buy

15  things out of above San Mateo.

16          This handcuff had gone to Neve's, and this

17  information just came out yesterday from the police department,

18  and from there we're still determining if it was in a lot of

19  handcuffs that was transferred to the Albuquerque Police

20  Department or not.

21  Q    Okay.  So does A.P.D. buy handcuffs from Neve's and other

22  local outlets?

23  A    Yes, sir.

24  Q    Okay.

25  A    And officers buy their own as well.

1    Q    All right.  Within A.P.D. is there a way of identifying a

2    pair of handcuffs as having been issued to a particular

3    officer?

4    A    No, they're no longer -- they don't keep the serial

5    numbers.

6    Q    Okay, so there is no way of knowing who that particular

7    serial number went to within A.P.D.?

8    A    Correct.

9    Q    All right.  One of the things that's mentioned in the

10   Statement of Probable Cause is that a perimeter was established

11   once enough officers got there to do that?

12   A    Correct.

13   Q    Could you describe the outline of the perimeter for us?

14   A    It's north of -- from Central north, probably two blocks,

15   I would imagine, to Chico, and then from Eubank five blocks

16   west.  I don't know what the fifth street west of Eubank is.

17   Q    How do you maintain a perimeter that size?  That's a lot

18   of real estate.

19   A    There's officers that responded from all of the local

20   agencies, as well as different area commands as soon as the

21   call went out, and they sit on every corner of every block.

22   Q    All right.

23   A    And --

24   Q    Are you aware, based on your review of whatever you have

25   reviewed in this case, how long it took A.P.D. or all of the

1   law enforcement responders to establish that perimeter?

2   A    I don't know that time, I know it was very quickly that it

3   was established.  That's what I have been told, it was -- all I

4   have been told is that it was set up right away.

5   Q    Okay.  That seems like it would take a while to assemble

6   the necessary personnel to do it.  I mean, it wouldn't happen

7   within two minutes of the call going out, I would say maybe

8   within 30 minutes?

9   A    It would be done faster than that.

10  Q    Okay.

11  A    These officers do it every day.  They're setting up

12  perimeters in different area commands, they know where to go

13  and what to do.

14  Q    All right.  Can you tell us anything about the condition

15  of the officer?

16  A    Currently he's still in critical condition, they are

17  stating he still is stable.

18          **MR. ROBERT:**  Your Honor, could I have a moment,

19  please?

20      **(Pause)**

21  Q    Do you know whether there was any video recording or any

22  other kind of recording that was collected from businesses or

23  other possible sources of video within the area of the

24  incident?

25  A    I was told the Walgreens video had -- they had a camera on

1  the southeast corner of the building and it's pointed to the

2  north and east, which is where Officer Webster conducted the

3  traffic stop.  And that video apparently has some obstructed

4  views.  I've requested that as well and have not yet received

5  it.

6  Q    Okay.  Would it go directly to you or to somebody else in

7  APD?

8  A    It would -- APD would get it, and then I would have to

9  gather it from them.

10 Q    All right.  Do you know of any other source of video?  Are

11 there any other businesses or even governmental city cameras

12 anywhere within the vicinity of all of this happening?

13 A    I had asked.  There is a camera on the southeast corner of

14 Eubank and Central that's, like, a DOT street camera up in the

15 air, and I was told it does not record; it's only a live feed.

16 But that is all I am aware of.

17 Q    Who monitors that live feed; do you know?

18 A    I have no idea, sir.

19          **MR. ROBERT:**  All right.

20          That's all, your Honor.  Thank you.  I'll pass the

21 witness.

22          **THE COURT:**  All right.

23 //

24 //

25 //

**REDIRECT EXAMINATION**

**BY MR. WISHARD:**

Q    Officer Wright, after the defendant was arrested, did he make any statements you're aware of?

A    Well, when I transferred Mr. Lyman to court yesterday morning for his initial appearance, while in the back seat of the patrol car, we were traveling southbound on I-20 -- 25 at Paseo, and he did ask myself and Task Force Officer Hernandez how the officer was doing.

Q    Did he make any statements on Saturday when he was released from the hospital?

A    He made a statement to the -- to -- after his DNA had been collected, the two uniformed officers, as we were going to get ready to transport him, were in the interview room, and Mr. Lyman asked how the officer was doing.

Q    All right.

A    Something to that effect.

        **MR. WISHARD:**  Thank you.

        **THE COURT:**  Do you want to make any argument?

        **MR. ROBERT:**  There are gaps in this.  It was several hours between the time of the shooting and the time that Mr. Lyman was apprehended.  Obviously, the handcuff is an issue, but because of the lack of the ability to trace it from one office to -- from the source to the officer to this incident, it's -- I think raises at least a question mark about

1   the providence of the handcuff.

2          We don't have any information that ties Mr. Lyman to

3   the handgun other than that it was found within some blocks of

4   the vicinity in which the shooting took place and the vicinity

5   in which hours later Mr. Lyman was apprehended.  We don't have

6   the results of any testing, and we don't know very much about

7   the gun at all.  In other words, was the magazine full?  Was it

8   not?  Was there any indication that the gun had been discharged

9   recently?  Because I understand that's something that can be

10  tested for as well.

11         I recognize that probable cause is a low standard,

12  your Honor, but I do believe that there are significant gaps in

13  the knowledge that we have about this case at this time.  Those

14  gaps may be filled at some point, but the answers to those

15  questions remain open.  And I would ask your Honor to consider

16  that in determining whether there is probable cause.

17         **THE COURT:**  Okay.  All right.  Well, I've

18  considered -- and you're excused, by the way.

19         **THE WITNESS:**  Thank you.

20         **THE COURT:**  Any objection to me excusing the officer?

21      **MR. WISHARD:**  No, your Honor.  Thank you.

22      **MR. ROBERT:**  No, your Honor.

23      **THE COURT:**  Okay.

24     **(Witness stepped down)**

25  //

1          **THE COURT:**  All right.  Well, I have considered

2    Officer Wright's testimony today, as well as his probable cause

3    statement, because the defense has agreed to accept that as a

4    proffer for the Court's consideration of probable cause.  And I

5    find that based on all of the information before me that there

6    is probable cause to support the charge in the criminal

7    complaint.  As, Mr. Robert, you aptly recognized, the probable

8    cause standard is quite different from the proof at a criminal

9    trial, and there is probable cause based on all of the evidence

10   that supports the charge in the criminal complaint against

11   Mr. Lyman.

12          So, having probable cause -- having found probable

13   cause to support the charge in the criminal complaint, do you

14   wish to proceed now to the detention hearing?

15          **MR. ROBERT:**  Yes, your Honor.

16          **MR. WISHARD:**  Yes, your Honor.

17          **MR. ROBERT:**  Your Honor, I've received the Pretrial

18   Services report, which consists of a listing of criminal

19   history.  One glaring thing about that history is that the

20   majority of the things reflected on that history are nolle

21   prosequi or dismissed.  There is -- there are several cases

22   which have either been dismissed or are currently pending that

23   arise from the same incident on December 14th of last year.  I

24   know that this is a matter -- let's see; there are -- one, two,

25   three -- four different cases that relate back to that date,

1  all of which have been dismissed.  One of the -- one of the

2  entries reflects that the case is to be presented to the grand

3  jury, but after nearly a year, obviously, that hasn't happened

4  yet.

5          The point is that there is a fairly limited criminal

6  history.  Obviously, there is a conviction of significance back

7  in 2001 for which Mr. Lyman served a significant time in the

8  Department of Corrections and was paroled in May of 2011, four

9  years ago.  There is nothing in that criminal history that

10 suggests that Mr. Lyman is a flight risk.

11         There -- obviously, the nature of the current

12 offense -- well, the current offense charged is felon in

13 possession of a firearm.  Although the back story on this

14 matter is -- is alarming, the charge here is felon in

15 possession of a firearm.  And, so, the nature of the current

16 offense, notwithstanding other allegations, which may or may

17 not yet be presented against Mr. Lyman, is relatively minor.

18 He faces a 10-year maximum penalty on that charge.

19         Again, the criminal history does not suggest a risk

20 of flight.  And the danger, then, is limited to essentially

21 what is alleged in a broader sense in this whole context.  I

22 would submit, your Honor, that release to a halfway house could

23 accommodate any concerns about -- about flight risk and about

24 danger to the community.  Being placed in a structured

25 environment, being required to follow the rules of the halfway

1    house, and abiding by whatever other conditions the Court

2    imposes I believe would adequately resolve any concern that the

3    Court might have with respect to flight risk or danger, and I

4    would ask your Honor to consider releasing Mr. Lyman to

5    La Pasada.

6              **THE COURT:**  Does the Government wish to be heard?

7              **MR. WISHARD:**  Yes, your Honor.  Thank you.

8              Your Honor, there are a dearth of convictions, but

9    there are many, many arrests.  In fact, every year of the

10   defendant's life from the age of 13 to present, every single

11   year and sometimes multiple times a year, he has come into

12   contact with and been arrested by law enforcement.  The only

13   gap in his criminal history was the 10 years he spent in the

14   New Mexico Department of Corrections.

15             Also concerning is there are two instances, one in

16   which he was charged with escape and one in which he failed to

17   appear for a court sentencing -- or a court hearing.  We don't

18   have the details on that.

19             Finally, your Honor, after his release from prison

20   and beginning in the year 2012, the violence and frequency of

21   his offenses has increased, and it crescendoed last Wednesday

22   when he attempted the murder of a police officer here in

23   Albuquerque.  While those charges have not been filed, the

24   cross reference under felon in possession of a firearm would

25   refer the sentencing court to attempted first degree murder and

1   would come in at the very top of the guidelines.  In fact, it

2   would exceed the guideline sentencing chart.  Those charges

3   have not yet been filed with state court, but they include

4   attempted murder, assaulting a police officer, aggravated

5   assault with a deadly weapon, and a firearm enhancement.  The

6   United States is keeping the felon in possession; it would also

7   include tampering with evidence and a slew of lesser crimes.

8           For all these reasons, your Honor, we think that he

9   is very much a danger to the community and a flight risk, and

10  we concur with the recommendation of Pretrial Services that

11  there are no factors that can be fashioned to ensure his future

12  appearance in court and the safety of the community.

13          **MR. ROBERT:**  May I respond briefly, your Honor?

14          **THE COURT:**  Yes.

15          **MR. ROBERT:**  A great number of these things that the

16  Government has mentioned either were dismissed -- did not

17  result in a conviction.  And I -- I object to the notion that

18  anything -- any time somebody is arrested it means they're

19  convicted.  The idea that each of these encounters with law

20  enforcement indicates the guilt of Mr. Lyman of some offense I

21  think offends constitutional notions.  I would ask your Honor

22  to keep in mind, to consider that reality in this, and that

23  those things of which he was charged and did -- which did not

24  result in convictions should be considered, if at all, in a

25  very limited way.

1      **THE COURT:**  All right.  Well, although Mr. Lyman is

2  charged with felon in possession of a firearm in this court,

3  the Court is free to and obligated to consider the totality of

4  the circumstances before it in determining whether there are

5  any conditions that can be fashioned to adequately manage the

6  risk of nonappearance and dangerousness that Mr. Lyman poses

7  based on both the -- the circumstances surrounding the charges

8  for which I found probable cause, as well as the criminal

9  history that Mr. Lyman has.

10      There are numerous factors indicating that Mr. Lyman

11  poses a risk of nonappearance, not the least of which is the

12  flight that there is some information that Mr. Lyman engaged in

13  on October 21st of 2015.  There is also a prior escape charge

14  against Mr. Lyman, the, as I said, attempt to flee at the time

15  of his arrest.  There are -- there is at least some history of

16  a failure to comply with previous court orders, as well as some

17  indication of past poor performance under community

18  supervision.

19      There are also factors which indicate that Mr. Lyman

20  poses a risk of danger to the community.  The -- in considering

21  the probable cause in this case, the Court was required to

22  consider all of the circumstances, and although Mr. Lyman was

23  not found at the time of his arrest to have possessed the

24  firearm, the circumstances, the proximity of the firearm to the

25  shooting and to the location that Mr. Lyman was eventually

1   found hiding in, the fact that Mr. Lyman was wearing a handcuff

2   on his left arm all tend to indicate at least sufficient

3   evidence to cause a person to objectively and reasonably

4   suspect that Mr. Lyman was involved in the alleged incident

5   involving the officer who was shot.

6          The history that Mr. Lyman presents, the criminal

7   history, conviction history, as well as the arrest history

8   demonstrates that Mr. Lyman has had in his past multiple

9   arrests and convictions involving violent behavior.  There is a

10  history of weapons-related offenses, including an arrest as

11  recently as May 30th of this year for felon in possession of a

12  firearm.  The fact that there was a weapon involved in the

13  instant offense all demonstrate that Mr. Lyman does pose a risk

14  of danger to the community.

15         Given the totality of the circumstances, I find that

16  there are no set of conditions under which Mr. Lyman could be

17  released that would reasonably assure the safety of the

18  community or that he would not pose a continuing risk of

19  flight.  And for that reason, Mr. Lyman, I'm going to remand

20  you to the custody of the United States Marshals Service

21  pending your trial in this matter.

22         **MR. SPEAKER:**  Thank you, your Honor.

23         **THE COURT:**  Okay?  All right.  Is there anything

24  further?

25         **MR. WISHARD:**  No, your Honor.  Thank you.

**MR. ROBERT:**  No, your Honor.

     (Proceeding was adjourned at 10:50 a.m.)


                         CERTIFICATION


I certify that the foregoing is a correct transcript from the

electronic sound recording of the proceedings in the above-

entitled matter.




_____          December 15, 2015_


                    TONI HUDSON, TRANSCRIBER